Court will take the matter under advisement for disposition. Clerk, please call the last case in the morning. 310-002, Scott Hodges v. Decker, National Command. Good morning, Your Honor. May it please this Court, Counsel. Your Honor, this is a one-time industrial accident. It appears that the Industrial Commission and the arbitrator treated this almost as a repetitive type of exposure, unlike the, very similar to the case you heard earlier in U.S. Cannes. This is a one-time industrial accident where the petitioner, Scott Hodges, was exposed to a known chemical, phenol, which was identified in the material safety data sheets. Not only by Dr. Conaber, Dr. Lichen, Dr. Mercury, and Dr. Punja, but all of the doctors identified the one chemical that Mr. Hodges was exposed to. And the difference with this case, and amongst many others, is that all of the doctors, it's undisputed, agree that Mr. Hodges was exposed to phenol. All of the doctors agree that the phenol was the exposed agent that caused Mr. Hodges to suffer from his subsequent disability, except for one physician, and that's Dr. Conaber. And Conaber is the IME physician of Argonne National Lab, who was the ex-employee of Argonne National Labs, who apparently takes on the role of examining physician for Argonne in these types of situations. I am arguing to this Court that an instant replay is required. That De Novo, that this Court has De Novo jurisdiction over this case under well-established Illinois case law, under Buscio and under Boussiatis. And Boussiatis, I'm mispronouncing that, Boussiatis, Boussiatis clearly gives this Court jurisdiction to review the issue of causation. It is very rare, however, Boussiatis gives this Court the ability to review this case under De Novo jurisdiction because Dr. Conaber did not rely on all of the facts on this case in order to render the opinion which the arbitrator subsequently relied upon. Dr. Conaber ignored a significant fact in this case. Which was what? Pre-existing condition. His premorbid state, Your Honor. Mr. Hodges' premorbid state was one of a functioning, full-time, full-duty employee of Argonne National Lab. And that was not taken into consideration. And I believe the Castings case, which we cited to, is the case that allows us to look at that and overturn Conaber's decision, look at her opinion and say that it was incorrect. Well, what's the linkage between what you just said and Conaber's opinion? Conaber's dad, what you just referred to, full-time employee overturned Conaber's opinion. Because Conaber states that basically, without just saying it right here, that Scott Hodges is an alcoholic. That his condition is due to alcohol, either abuse or because of alcoholism. Okay, so that's, yeah, basically that's underlying that. That's what she is saying. Do you have to suggest that you have this dormant, non-symptomatic, that you're saying, I guess it's called whatever the term is, but that this phenol brought it into being? Your Honor, I can't even say that the phenol awakened some sort of alcoholism because there was a condition here. The condition was the phenol exposure and immediately thereafter, there was symptoms. It really, it defies logic to look at this case and not find a causality between the exposure, the immediate onset of symptoms, and the subsequent disability that resulted from it. We still have a causation, logical causation, that has to be found. I mean, otherwise, it's post hoc or co-co-co. Correct, Your Honor. And again, the logical causation is the evidence that's presented by all of the other physicians. Namely, we can look at Lichen, who's the toxicologist. And Lichen, I know there was a suggestion in the Respondent's brief and also in the arbitrator's decision that Lichen did not rely on facts and science, but that is absolutely incorrect. Lichen, and I have the list, Lichen based his opinions on science and fact. Number one, he testified that there was an event. Nobody disputes that there was an event here. There were multiple people who were exposed. Well, I don't even think that's in play here. I don't think that the Respondent is disputing there was an event here. But that's what I'm saying, Your Honor, but it's important of the undisputed portion of it so that you can review this de novo. There was a chemical which was identified. Nobody disputes the chemical. The chemical was identified through the MSDS sheets. There was the immediate onset of symptoms, which all of the people who were exposed to at that location on that same date at that one-time exposure complained of. They all testified, and they all complained of the same type of smell, and they complained of the same types of symptoms. Clearly, we have a temporal relationship. But here's one of the things that I didn't mean to ask you before we get sidetracked, and I think this is critical. Yes, Your Honor. It's my understanding from the record, only Dr. Canabare based her opinion on the actual level of phenol exposure, which obviously would have to be significant. None of the other doctors addressed the level of the phenol to which the claimant was exposed or offered a causation opinion based upon that information. Is that correct? I disagree. Isn't that a significant difference? I disagree. Lichen in the page 427 of his record, I believe, also cited to the level of phenol. And, Your Honor, may I point to you that that urine count was taken on January 5. This exposure occurred on January 2. So even if we want to look at that urine phenol count in a narrow window, it's abnormal. 12 is abnormal. No matter how you want to characterize it, it is above the normal count. And that was taken three days after the exposure. And that was by Dr. Stalker at Argonne Lab, who requested that Mr. Hodges come into his office and undergo examination. So three days, there was a significant, now the word is escaping me, desynthesization of the phenol in Mr. Hodges' count. So it's a very good point, because even 12, three days later, is abnormal. Doesn't that count? And cannot that count for his symptoms? What we've done, Your Honor, is we've established a prima facie basis for exposure and causality. It defies logic that his symptoms following this occurrence, which were never complained of, if you look at the old adage of the one tick of the clock. At the one tick of the clock before this occurrence, where were these symptoms? Where was Mr. Hodges' disability, according to Industrial Commission definition, as far as his ability to work? All of that counts. It is critical to the analysis of this case to determine proximate cause. And Dr. Conover is stating that alcohol is the only cause. And so what causation opinions do you have to contradict that? He had no symptoms prior to exposure, even if he was guilty of alcohol abuse, I think is the argument. I'm sorry, Your Honor, I didn't hear it. I said I think the argument is that he had no symptoms prior to exposure, even if he was guilty of alcohol abuse. That is correct. That is the argument here. I mean, the symptoms of lightheadedness, nausea, vomiting, and the wooziness, none of them were present. I mean, it would have to be. I understand the argument. You don't need the medical. You could rely on the good health, and then after the incident or exposure, he could have symptoms. But I was just wondering, in addition to making that logical argument, do you have any medical evidence that connects the exposure to the condition? Well, I think Dr. Lykin clearly states in his report. I mean, he clearly ties the proximate causation between phenol. He goes on and on. I mean, as a matter of fact, even when he reports, if Your Honors disregard entirely my argument of res judicata, I'm sorry, of collateral estoppel with the U.S. Department of Labor report, look at what Dr. Lykin reports to the U.S. DOL in terms of the basis for their findings. You don't have to rely on U.S. Department of Labor if you feel that that argument is either stale or I didn't raise it at some other point. But just look at what he relies upon in terms of his basis for his opinion. And he explains exactly what it is. And that's why I say it defies logic. And if we go to Conabare, you know, Conabare does have a bias here. She does have motive. Is it evident? No. But it's there. It's out there. As an ex-employee, how does one give an opinion when that opinion is suggested in the introductory letter to Dr. Conabare in terms of what she should find? Dr. Stalker clearly suggested the opinion that she should render in the introductory letter to her. Does the commission know that? Yes, Your Honor. Absolutely. So how does that upset the commission's decision? It upsets the commission's decision because if we reverse and if we go under manifest weight of the evidence, you know, if you look at the standard of manifest weight, if Your Honors choose to look at manifest weight, you know, I don't know where that falls. I guess it falls somewhere between beyond a reasonable doubt and preponderance of the evidence. Because an opposite conclusion is clearly apparent. And that's exactly it. An opposite conclusion is clearly apparent because Conabare failed to rely on premorbid state, which goes to Justice Hoffman when he said about there's no symptomatology before this. If there are no symptoms, I can't even say that this was an aggravation. And I'm not going to because there's no indication that it was an aggravation. These are new symptoms, new findings. And I behoove counsel for respondent to find anywhere in the record where these exact symptoms were found in the record to the physicians before this because they weren't. So the issue is very narrow here. We have exposure. It's simply the causation of those symptoms to disability. And under de novo, this Court may review this case under de novo, under established case law. And if Your Honors choose not to review this de novo, manifest weight is clearly a standard which you may review this under because an opposite conclusion may be reached based upon Conabare's ignoring certain facts, clearly not basing her opinions on that, and the totality of all the circumstances here. I have a question here. You're talking about there's no symptoms prior to this incident, right? You're saying that's important? Yes, Your Honor. Well, isn't the preexisting condition she's suggesting, though it's dormant, okay, would imply there would be no symptoms and that the symptoms that did develop after the incident were more related to that preexisting condition, that toxic encephalopathy? The toxic encephalopathy. Yes. I agree with you. Had there been a diagnosis of alcohol abuse or alcoholism before this? Well, let's see. This issue comes up only post-occurrence, Your Honor. But how did she come up with the concept of alcohol abuse except by prior medical records, right? There was, yeah, I think it was Dr. ‑‑ I believe it was Dr. Mercury who was the internist who had some indication in there. But there was never a diagnosis of alcoholism made or even a recommendation for treatment. And most importantly, Your Honor ‑‑ But if you look at the records and look at how many beers are consumed every day, I mean ‑‑ Oh, no, Your Honor. That was an extrapolation made by the arbitrator. That number was an extrapolation that the arbitrator made on his own. I so disagree with that analysis that he made because somebody could say, yes, I consumed ten of something and then you're going to multiply that ten times every day of the month and times the year. So I don't agree with that. I don't agree with that interpretation. Where did that figure come from? From medical records? What came from the medical ‑‑ 10 to 12 beers a day. That came from the medical records. Okay. That came from the medical records. But, again, if we look at ‑‑ Those medical records were looked at by Dr. Conover? Yes. Okay. But, again, Your Honor, I just want to emphasize that the disability occurred during a one‑time traumatic event. Typically, exposure cases, I shouldn't say typically, but more likely than not, they occur over time. This was not. This was at Argonne Lab while they were demoing out one of the testing rooms and they were exposed. So this was a one‑time exposure, hazmat type of call. Counsel, you'll have time on rebuttal. Thank you, Your Honor. Counsel, please. Good morning. My name is John Campbell, counsel. I'm here on behalf of Argonne National Lab, the appellee in this case. And I want to ‑‑ there's a lot of elements here addressed by counsel. I'm going to try to get to them all succinctly. But first and foremost, I want to point out this is and always has been a question of fact. Whether or not the phenol exposure was sufficient to cause these symptoms. It's a question of fact and, therefore, this is a manifest way to the evidence review. The case side of this national castings case where the court appeared to use a de novo review despite there being only an issue of fact, what the court pointed out in that case, because I read it carefully, I knew it would come up, is that the respondent's doctor actually qualified his opinion on deposition and said, well, there could be an exposure. And for that reason, there was a reversal. I actually view that as a reversal on manifest way, but I digress. There's a difference here. When Dr. Conabare conducted her examination, she did review all of the material data safety sheets, the industrial hygiene tests, all of the medical reports from the days following this event. None of the other doctors did. None of them. That is why Dr. Conabare's opinions were considered to have more weight by all of the prior trials of fact. Can you address the threshold question? Your opposing counsel lays out a chronology that I think, quite frankly, has some superficial appeal. He's saying that, look, there's no dispute by anyone, including Argonne, that there was an exposure to phenol. He's symptom free. All of a sudden he ends up with these symptoms. Can't the argument be made, obviously the exposure had a causal connection to his condition. How do you argue it did not? I think that would be an excellent argument if we weren't at Argonne National Lab and didn't have all of the testing performed that rebut that conclusion. I'm not pointing to just the urine samples and the blood samples, which arguably were taken a few days later, where the substances were found in nobody's body, petitioners or any of the other workers. For the sake of argument, let's say, well, maybe they were exposed that day. Well, there were vapor readings from the room. The thermometer itself was tested and had inconsequential amounts of phenol and mercury. If you look at that industrial hygiene test, they went so far as to take another exact replica of that thermometer and tested its contents to make sure that the levels couldn't be enough to garner an exposure to harm anybody. No levels were ever found sufficient enough to be outside of OSHA guidelines and were all inconsequential. So how did he end up with the high level? He's been drinking 3,600 beers a day. Oh, I'm sorry. With regard to the phenol, I thought you meant the toxic encephalopathy. You mean with regard to the phenol? Well, I think that is a red herring. Counsel is saying that a reading of 12 micrograms per liter is elevated. It is not. And if you actually read the record, you'll see that you can have a reading. Was he 15 or 12? He was 12. He was 12. And isn't it 10 to cut off? 10 is effectively the background level. You can have a reading of 20 by using lip balm or Carmex or a throat lozenger. And Dr. Conover points that out. So do the industrial hygienists when they evaluate the case. So to suggest that 12 is an elevated level is really incorrect. It's flat out incorrect. And Dr. Conover points that out. So you're saying all of the other people that were in the room who were also exposed to the same levels as the claimant here did not show any? The highest levels, and it's in the record, the highest levels shown were 20. And that was deemed to be because they were using Carmex or lip balms. So they commented on why the reading on at least one or two individuals was elevated to 20. And that was found to be because they used lip balm. And the drinking of the beer, then, you're saying? Yeah. I'm sorry. I think I answered too quickly. That doesn't affect phenol as much as it affects the underlying diagnosis, which is the same for alcoholism as it is for a phenol exposure, which would be toxic encephalopathy. No. Changing the facts a little bit. Let's say that the claimant admits, I'm an alcoholic. I have toxic encephalopathy or whatever. Right. But it's normal. Now I got exposed to phenol at an elevated level, and now I'm symptomatic? Right. Is that recoverable? That is why I go back to all of the evidence that Dr. Conover reviewed to conclude that it is not because it's, in fact, impossible to have suffered these symptoms. Even in an aggravation of a preexisting condition, if all of the levels tested are far under the acceptable levels for what would be considered an occupational exposure. Well, but that is, in fact, based on a non-alcoholic person. Well, Dr. Conover certainly knows that he was alcoholic, as she states it, so I have to assume, without being able to ask her now, that it was based on the presumption he was. But you understand the importance of that distinction. I do, and that's why I've said in every level arguing this case that if this weren't Argonne National Lab where they could conduct these tests, I think they have to. Yeah, but it doesn't matter. It doesn't matter. I don't care. They've conducted the test. But now we've got a special case here, arguably, an alcoholic who's got dormant whatever that condition is. And it may well be that alcoholics exposed to what would be considered to be a normal background level of phenol can get these symptoms. It may be that alcoholics using lip balm or these throat lozenges get these symptoms. But the fact is he was exposed to phenol in the workplace and got these symptoms. Would that be compensable? Okay. I don't believe so in this case because of the levels demonstrated by all of the scientific testing done. And that's why I think that's – I'm coming back to that, Your Honor, because I believe that to be so important. Wait a minute. Isn't there sort of a flaw in your argument? You're saying that these levels mean they're safe. Safe for who? The average human being or safe for the alcoholic? That was never addressed in terms of the material safety data sheets or the industrial hygienist. But I'll point out that those levels, if safe was five parts per million, the levels found were 15 parts per billion. It was such an inconsequential amount. And by the way, it's worth noting, when the thermometer broke, the gentleman, Mr. Hodges, was not there. He came in, he directed other people to dispose of it, and he left for lunch. He came back and smelled the odor. And by that time, the fire department was called as a precaution because there was concern that there was some burden. I think I understand where I think my learned colleague is going. You have the convergence of two doctrines. One, the employer takes the claimant as they find them. And two, under CISPRO, the aggravation of a preexisting condition would still be compensable. So that's the theory that's being advanced. I understand, and that is why, again, relying on Dr. Conover, who found it is not a causally related. In other words, you're saying this could have had no effect even on somebody who was an alcoholic? Is that what you're saying? Absolutely. And I think all of the evidence demonstrates that. Why is that? Because the gentleman drank before and after, and his symptoms can be more readily explained by the continued consumption of alcohol, which is toxic, leading to the diagnosis of toxic encephalopathy. Well, do you know how many – you said something about – you said 3,600 beers a day, which I assume – Yeah, the arbitrator said it, yeah. It was a misstatement, obviously. I don't know that that's a misstatement. It's gleaned from the fact that he said he drinks 10 or 12 beers a day, so. 3,600 beers a day? Did I say a day? A year. I'm from the South Side, but even we can't – We can take judicial notice that that's impossible. All right, yeah, 3,600 a year is what the record said. If you finish with your questions, a few other points that he raised. The collateral estoppel argument, I just – I want to point out, I don't know if the Court's going to take heed to it with any merit, but this is barred for a number of reasons. This was not a hearing that the Department of Energy had. This was a phone call to the petitioner, and they accepted one letter from Dr. Leakin to base their decision. There was no opportunity for contrary evidence to be presented. The collateral estoppel would not apply, I mean. I don't believe so, Judge. I just – I wanted to make sure I addressed that. And, again, ultimately, it is the Commission's discretion to weigh evidence. The fact that Dr. Leakin had none of the research from the days following this incident to base his opinion, the arbitrator, Commission, and circuit court judge all recognized that the opinion had less weight because he did not have all this information, was not privy to it when he offered his opinion on causal connection. That is why Dr. Conover's opinion was considered more valuable. It is within the discretion of the Commission, and, therefore, this should be affirmed unmanifestly. Thank you. Counsel, please, Mr. Reynolds. Thank you, Your Honor. The restatement of torts indicates that to establish proximate causation, a plaintiff must show that an event in the natural or probable sequence produced the injury complained of. And that's exactly what we have here. We have natural, probable sequence of events. We have exposure – I'm sorry. We have event, exposure, complaints, and subsequent complaints of disability. And before the event, there's a tabula rasa. It's a blank slate of anything with respect to complaints or even disability. So you couldn't convince Commissioner Mason or Dauphin with respect to your position? They relied on Dr. Conover, which is what the arbitrator relied upon. And, Your Honor, that's why I'm saying instant replay up from the booth. This is a de novo review on causation. The red herring in this case is the CARMEX and the throat lozenges. That, to me, is a red herring and disingenuous to believe that a fenal count, an abnormal fenal count three days post-occurrence is related to CARMEX when nobody ruled out these other issues at the time of the urine count or even a year afterwards. That was given in an evidence deposition as other substances that contain fenol. And don't forget, there was a demolition project in room 212 at Argonne National Laboratory. There was a demolition project of walls. Who's to say that the fenol didn't come from the walls and not only the thermometer? Because many people were exposed during the event and subsequent to it. One of the things that Liken relies upon here is that other people were also exposed and also had the same complaints. That counts. That amounts to your decisions in looking at this case and determining that the arbitrator and the commission made erroneous findings. They relied on flawed testimony and evidence here. The evidence can't be any clearer. And I know it's hard to sit in the back of this room and listen to argument after argument, just like in the U.S. can in the Sanborn case, when people just have this, they slightly tip the scale, which is what we have done here by establishing a prima facie case. Did Dr. Liken testify? By evidence deposition? No, he did not testify. All of his records were submitted. But we've established our prima facie case. We've tipped that scale to indicate that he was exposed and there was causation afterwards. And I would ask this Honorable Court to reverse the decision of the Circuit Court of Will County and find that the exposure did cause Mr. Hodges' disability. Thank you. Thank you, Counsel. The court will take the matter under advisement for disposition and stand recess until approximately 1.30. Thank you.